1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MARY MARTINEZ,<br><br>    Plaintiff,<br><br>  v.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>    Defendant. | Case Number C 04-04368 JF<br><br>ORDER[1] DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REMANDING TO THE COMMISSIONER OF SOCIAL SECURITY FOR FURTHER PROCEEDINGS<br><br>[Docket Nos. 13 and 14] |

　　　Plaintiff Mary Martinez ("Martinez") filed this action on October 15, 2004, seeking reversal of the decision by Defendant Commissioner of Social Security ("Commissioner") to deny her supplemental security income ("SSI") benefits based on disability.  Martinez filed a motion for summary judgment on March 10, 2005.  Defendant filed a cross-motion for summary judgment on April 11, 2005.  The matter was submitted without oral argument.

---

[1] This disposition is not designated for publication and may not be cited.

# I. BACKGROUND

Martinez was born in Colorado on August 7, 1946.  TR 62 and 346.  She attended school until the third, fourth, or fifth grade.[2]  TR 144 and 346.  She has testified that she cannot read or write.  *Id*.  She required assistance in completing the application forms for SSI.  *See, e.g.*, TR 80, 99, and 117.  From about 1980 to 1990, Martinez was employed in an electronics assembly job and, on the weekends, for eight hours per week washing dishes at a restaurant.[3]  TR 82 and 363-64.  The records of Martinez's employment during the 1990s are inconsistent.  She reported that she worked in machine shops for three different companies from 1990 to 1991, 1991 to 1993, and 1996 to 1998.  TR 82.  However, according to a document entitled "DISCO DIB Insured Status Report," she had no earnings in 1990 through 1997, and earned approximately $8,900, $18,700, and $17,750 in 1998, 1999, and 2000, respectively.[4]  TR 67.  Martinez was a "wrapper" in the machine shop, where she was responsible for wrapping parts and packaging them in boxes.  TR 348 and 366.

On December 11, 2001, at the age of 55, Martinez applied for SSI.  *Id*.  She claimed disability based on arthritis in her hands and knees, eye problems including blurred vision, difficulty walking, standing, and sitting, a problem with her kidneys, diabetes, and nausea.  TR 69.  The claim was denied on March 28, 2002, and denied again after reconsideration on January 3, 2003.  TR 15.  The Social Security Administration conducted an administrative hearing on October 8, 2003.  *Id*.  On May 18, 2004, the Administrative Law Judge ("ALJ") issued a decision determining that Martinez is not eligible for SSI.  TR 15-22.  The ALJ found that Martinez had "not engaged in substantial gainful activity since the alleged onset of disability," and that her "mild osteoarthritis, and history of obesity, diabetes, and high blood pressure without end organ damage or significant ongoing neuropathy are considered 'severe' . . ."  TR 21-22.  However, the

---

[2] Martinez's education level is reported inconsistently in the record.

[3] The ALJ noted at the hearing that he would not consider the dish-washing job.  TR 365.

[4] In her motion for summary judgment, Martinez notes that "[s]he had not worked since 2000."  However, she does not list specific place(s) of employment through 2000.

2

1  ALJ did not find Martinez's allegations of disability entirely credible.  TR 22.  Concluding, that

2  Martinez's impairments did not meet one of the listed impairments and that she could perform

3  her past relevant work, the ALJ determined that Martinez is not eligible for SSI.  *Id.*  On

4  September 9, 2004, the Social Security Appeals Council denied Martinez's request for review.

5  TR 5.

6

7                                    **II. LEGAL STANDARD**

8  **A.      Standard of Review**

9          Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the

10  Commissioner's decision denying Plaintiff benefits.  The Commissioner's decision (here the

11  decision of the ALJ) will be disturbed only if it is not supported by substantial evidence or if it is

12  based upon the application of improper legal standards.  *Moncada v. Chater*, 60 F.3d 521, 523

13  (9th Cir. 1995); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).  In this context, the

14  term "substantial evidence" means "more than a mere scintilla but less than a preponderance - it

15  is such relevant evidence that a reasonable mind might accept as adequate to support the

16  conclusion."  *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1257.  When determining whether

17  substantial evidence exists to support the ALJ's decision, the Court examines the administrative

18  record as a whole, considering adverse as well as supporting evidence.  *Drouin*, 966 F.2d at

19  1257; *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).  Where evidence exists to support

20  more than one rational interpretation, the Court must defer to the decision of the ALJ.  *Moncada*,

21  60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

22  **B.      Standard for Establishing Disability Under the Social Security Act**

23          A person is "disabled" for purposes of receiving social security benefits if he or she is

24  unable to engage in any substantial gainful activity due to a physical or mental impairment which

25  is expected to result in death or which has lasted or is expected to last for a continuous period of

26  at least twelve months.  *Drouin*, 966 F.2d at 1257; *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th

27  Cir. 1984).  The Social Security Regulations set out a five-step sequential process for

28  determining whether a claimant is disabled within the meaning of the Social Security Act.

3

1   *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  The burden of proof is on the claimant as

2   to steps one through four.  *Id*.  At step five, the burden shifts to the Commissioner.  *Id*.  If a

3   claimant is found to be "disabled" or "not disabled" at any step in the sequence, the

4   Commissioner need not consider subsequent steps.  *Id*.  The five steps are:

5         Step 1. Is the claimant presently working in a substantially gainful activity?  If so, the

6   claimant is not disabled within the meaning of the Social Security Act and is not entitled to

7   disability insurance benefits.  If the claimant is not working in a substantially gainful activity,

8   then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.

9   *Id*.

10        Step 2. Is the claimant's impairment severe?   If not, then the claimant is not disabled and

11  is not entitled to disability insurance benefits.  If the claimant's impairment is severe, the

12  claimant's case cannot be resolved at step two and the evaluation proceeds to step three.  *Id*.

13        Step 3. Does the impairment meet or equal one of a list of specific impairments described

14  in the regulations?   If so, the claimant is disabled and therefore entitled to disability insurance

15  benefits.   If the claimant's impairment neither meets nor equals one of the impairments listed in

16  the regulations, then the claimant's case cannot be resolved at step three and the evaluation

17  proceeds to step four.  *Id*.

18        Step 4. Is the claimant able to do any work that he or she has done in the past?  If so, then

19  the claimant is not disabled and is not entitled to disability insurance benefits.  If the claimant

20  cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step

21  four and the evaluation proceeds to the fifth and final step.  *Id*. at 1099.

22        Step 5. Is the claimant able to do any other work?  If not, then the claimant is disabled

23  and therefore entitled to disability insurance benefits.  If the claimant is able to do other work,

24  then the Commissioner must establish that there are a significant number of jobs in the national

25  economy that claimant can do.  There are two ways for the Commissioner to meet the burden of

26  showing that there is other work in significant numbers in the national economy that claimant can

27  do:  (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational

28  Guidelines.  If the Commissioner meets this burden, the claimant is not disabled and therefore

4

1 not entitled to disability insurance benefits.  If the Commissioner cannot meet this burden, the

2 claimant is disabled and therefore entitled to disability benefits.  *Id*.

3

4 **III. DISCUSSION**

5 *a.  Treating physicians*

6       Martinez argues that the ALJ did not give proper weight to the opinions of her treating

7 physicians.  Martinez identified Dr. Marcie Levine as her treating physician.  TR 71.

8 Additionally, on January 27, 2004, Dr. Kwan Pun completed an assessment form describing

9 Martinez's physical limitations.  TR 316-20.  The ALJ presumed Dr. Pun to be an associate of

10 Dr. Levine's, as both doctors share the same business address.  TR 19, 71, and 320.  Pursuant to

11 the Social Security Administration regulations, the opinions of an applicant's treating physicians

12 are given more weight than those of other physicians, "since these sources are likely to be the

13 medical professionals most able to provide a detailed, longitudinal picture of [the applicant's]

14 medical impairment(s) and may bring a unique perspective to the medical evidence that cannot

15 be obtained from the objective medical findings alone or from reports of individual

16 examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. §

17 404.1527(d)(2).  The Social Security Administration "will always give good reasons in [its]

18 notice of determination or decision for the weight we give your treating source's opinion. *Id*.

19       Martinez argues that the ALJ erroneously disregarded the opinion of her treating

20 physician that she had carpal tunnel syndrome.  The ALJ relied on the opinion of a consulting

21 physician, Dr. Gable, who conducted an in-person exam of Martinez on December 7, 2003.  He

22 concluded: "I think she could lift, push or pull 30 lbs. occasionally and 20 lbs. frequently.  I don't

23 see any limitation on fine finger and hand movement."  TR 312.   Martinez points out that Dr.

24 Levine's records include positive Phalen's, Tinel's, and Finkelstein tests on August 11, 1995 and

25 a positive Phalen's test on May 15, 2003, all of which are suggestive of carpal tunnel syndrome.[5]

26

27       [5] Citing *Merck Research Laboratories, Merck Manual of Diagnosis and Treatment* [sic]
(17th ed. 1999), Martinez notes that the Phalen's and Tinel's signs are used to diagnose carpal

28 tunnel syndrome, and the Finkelstein test is used to diagnose tenosynovitis.  However, Martinez

5

1    TR 292 and 306.   She argues that because Dr. Gable's opinion does not demonstrate that he used

2    any particular tests for carpal tunnel syndrome, his opinion should be disregarded.   Martinez

3    construes the regulations to require that the medical opinion be supported by particular medical

4    signs or laboratory findings.  In fact, the cited regulation merely gives guidance with respect to

5    how much weight a particular medical opinion will be given: "The more a medical source

6    presents relevant evidence to support an opinion, particularly medical signs and laboratory

7    findings, the more weight we will give that opinion." 20 C.F.R. § 404.1527(d)(3).  It is the role of

8    the ALJ to weigh the evidence, and it is not the role of this Court to second-guess a finding of

9    fact made by the ALJ.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) ("Where the

10   opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating

11   source is based on independent clinical findings that differ from those of the treating physician,

12   the opinion of the non-treating source may itself be substantial evidence; it is then solely the

13   province of the ALJ to resolve the conflict.").

14        The Ninth Circuit has held that "an ALJ may not reject treating physicians' opinions

15   unless he 'makes findings setting forth specific, legitimate reasons for doing so that are based on

16   substantial evidence in the record.'" *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996)

17   (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989)).  At the point in the ALJ's

18   decision where he rejects the allegation that Martinez "would be unable to lift or carry more than

19   5 lbs. occasionally and would be unable to perform frequent manipulative hand or finger

20   movements," it is not clear that the ALJ is rejecting the opinion of a treating physician.  TR 20.

21

22   _____

23   did not submit to the Court the relevant portions of the *Merck Manual of Diagnosis and Therapy*.
     Noting the prominence of  the *Merck Manual of Diagnosis and Therapy*, the Court takes judicial

24   notice of the online version of this manual, *available at* http://www.merck.com/mrkshared
     /mmanual/home.jsp.  Chapter 61 of the *Merck Manual of Diagnosis and Therapy*, "Common

25   Hand Disorders," includes the following description of carpal tunnel diagnosis: "Diagnosis is
     indicated by a positive Tinel's sign, in which the tingling (paresthesia) is reproduced by tapping

26   with a reflex hammer at the volar surface of the wrist over the site of the median nerve and carpal
     tunnel. Additional tests include wrist flexion maneuvers (eg, Phalen's sign)." *See*

27   http://www.merck.com/mrkshared/CVMHighLight?file=/mrkshared/mmanual/section5/chapter6

28   1/61b.jsp%3Fregion%3Dmerckcom&word=phalen's&domain=www.merck.com#hl_anchor.

Case No. C 04-04368 JF
ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REMANDING TO THE
COMMISSIONER OF SOCIAL SECURITY FOR FURTHER PROCEEDINGS
(JFLC1)

1   To the extent that he is, the Court presumes that he is rejecting the opinion of Dr. Pun, which

2   includes specific statements about Martinez's lifting capacity and hand or finger movements.  TR

3   319.  The ALJ set forth legitimate reasons based on substantial evidence in the record for giving

4   "more weight to the unanimously less restrictive medical opinions" of the non-treating physicians

5   than to the opinion of Dr. Pun.  TR 19.  The ALJ concluded Dr. Pun's opinion that Martinez

6   "would be unable to perform at least some degree of light work" was "not supported by objective

7   medical signs and laboratory findings sufficient to support such limitations." *Id*.  The ALJ also

8   noted that there was a conflict in the opinion of Dr. Pun: "on the same page, Dr. Pun opined that

9   the claimant would be restricted to sitting for 'less than 2 hours' and then 'more than 2 hours.'"

10          Although the ALJ set forth legitimate reasons based on substantial evidence in the record

11   for disregarding Dr. Pun's opinion generally, it is troubling to this Court that the ALJ noted

12   further that he found "no objective evidence of ongoing problems with carpal tunnel since 1995."

13   TR 20.  Treating physician Dr. Levine's medical notes include a positive Phalen's test on May

14   15, 2003.  TR 306.   While this test may not have been pointed out to the ALJ—and it is very

15   unlikely that someone without medical training would have noticed it in the record without it

16   having been pointed out—it nonetheless is present in the record.  It is at least possible that the

17   ALJ's conclusions with respect to Martinez's hand and finger capabilities were not based on

18   substantial evidence in the record.

19          Martinez also argues that the ALJ erroneously rejected the opinion of her treating

20   physicians that her depression and anxiety are disabling.  As to this point, the ALJ properly

21   weighed the conflicted evidence in the record.  While Dr. Levine's medical notes include

22   indications that Martinez suffered from anxiety and depression, *see, e.g.*, TR 215, 224, 227, 236,

23   and 265, there is substantial evidence in the record supporting the ALJ's decision to consider

24   Martinez's mental impairments "non-severe."  Based on a comprehensive psychiatric evaluation,

25   Dr. Antoinette Acenas found "[n]o psychiatric diagnosis." TR 283.  This Court must defer to the

26   ALJ's weighing of the conflicting evidence.

27          Next, Martinez argues that the ALJ erroneously disregarded test results showing that she

28   is mentally retarded.  The Court agrees.  On February 28, 2002, Dr. Ubaldo Sanchez conducted a

7

1   psychological evaluation of Martinez, from which he concluded:

2           Ms. Martinez obtained a Verbal IQ score of 69, a Performance IQ score of 75, and
            a Full Scale IQ score of 69 on the WAIS-II.  This indicates that she is currently
3           functioning in the mentally retarded range of measured intelligence.

4   TR 146.  The ALJ noted that Dr. Sanchez cautioned that "Ms. Martinez' scores must be viewed

5   with caution since her cultural background varies from the population the WAIS-II was normed

6   on."  TR 16 and 146.  However, it is not clear what precisely motivated the ALJ to discredit the

7   medical evidence of retardation.  Later in his decision, the ALJ wrote:

8           [T]he undersigned finds it highly unlikely that a morbidly intellectually limited or
            mentally retarded individual would be able to work as a shipping and receiving
9           clerk or sustain another job as an electronics assembler for 10 years (Exh. 9-F, p.
            2), in fact, earning more than $17,000 for both 1999 and 2000 (Exh. 3-D., p. 2).
10          The claimant was able to pass the written DMV driver's examination.

11  TR 21.  The ALJ appears to have reached a medical conclusion based on his own personal

12  impressions of whether a mentally retarded person could perform at a certain level.  As Martinez

13  argues in her reply, the ability to work is not dispositive.  Pursuant the Social Security

14  Administration regulations, someone can be deemed mentally retarded when he or she has "[a]

15  valid verbal, performance, or full scale IQ of 60 through 70 *and a physical or other mental*

16  *impairment* imposing an additional and significant work-related limitation or function."  20

17  C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C) (emphasis added).  Thus, it is possible that

18  Martinez might not have been considered mentally retarded during the time period that the ALJ

19  considered dispositive, but later developed a physical or other mental impairment such that she

20  became mentally retarded under the Social Security Administration regulations.  Additionally,

21  the ALJ provides no basis in the record for his implied finding that possession of a driver's

22  license indicates that she passed the written DMV driver's examination.  It is entirely possible

23  that Martinez did not take a written examination; in fact, Martinez's prior counsel stated in her

24  brief to the Social Security Administration Appeals Council that Martinez was given an *oral*

25  drivers examination.  TR 336.  Thus, it is entirely possible that the ALJ's conclusions with

26  respect to Martinez's mental retardation were not based on substantial evidence in the record.

27  *b.  Vocational expert testimony*

28          Martinez argues that the ALJ improperly disregarded the testimony of the Vocational

8

1    Expert that Martinez's past relevant work was "unskilled medium work."  TR 21 and 366.

2    Martinez argues that the ALJ's description of her past work as "light" was based on the way the

3    work was "generally performed," not on Martinez's own work experience.  Martinez cites 20

4    C.F.R. § 404.1565 for the proposition that the ALJ must consider only Martinez's own work

5    experience, not how it was generally performed.  While this regulation does note that the Social

6    Security Administration will "need to know about the amount of walking, standing, sitting,

7    lifting and carrying [the applicant] did during the work day, as well as any other physical or

8    mental duties of [the applicant's] job," the regulation does not restrict the evidence the ALJ may

9    consider in determining the level of the applicant's past relevant work.  20 C.F.R. § 404.1565.

10   Rather, the regulation describes what the Social Security Administration will consider when it

11   decides "whether [the applicant] is able to do work that is *different* from what [the applicant has]

12   done in the past."  *Id*. (emphasis added).

13          Moreover, the ALJ also based his determination that Martinez's past relevant work was

14   "light" on Martinez's own description of her work: "the undersigned notes that she earlier

15   described it closer to light work in her Disability Report."  TR 21.  In her disability report,

16   Martinez noted how many hours per day she could walk, stand, sit, climb, stoop, kneel, crouch,

17   crawl, handle, grab or grasp big objects, and write, type or handle small objects in her job as a

18   wrapper.  TR 70.  She also noted the amounts that she would lift and how frequently she would

19   lift them.  *Id*.  Based on his determination that Martinez had "residual functional capacity to

20   perform light work," and that her job as a wrapper, as self-described, was "light work," the ALJ

21   concluded that Martinez was able to return to past relevant work.  TR 21.

22          Martinez also argues that the ALJ did not ask enough questions, or the right questions, of

23   the Vocational Expert with respect to alternative work in the national economy is not relevant.

24   Because of these concerns and the possibility that the ALJ may make a different disability

25   determination on remand, the ALJ may choose to consider additional questioning of the

26   Vocational Expert on remand.

27

28

9

**IV. ORDER**

Good cause therefore appearing, IT IS HEREBY ORDERED that the parties' cross-motions for summary judgment are DENIED and the matter is REMANDED to the Social Security Administration for further proceedings consistent with this Order.


DATED:  March 20, 2006

_____
JEREMY FOGEL
United States District Judge

10

Case No. C 04-04368 JF
ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REMANDING TO THE
COMMISSIONER OF SOCIAL SECURITY FOR FURTHER PROCEEDINGS
(JFLC1)

1   This Order has been served upon the following persons:

2   Tom F. Weathered
    Law Office of Tom Weathered
3   999 16th St #7
    San Francisco, CA 94107-2468

4
    Leo Rufino Montenegro
5   333 Market St
    Suite 1500
6   San Francisco, CA 94105

7   Sara Winslow
    United States Attorney's Office
8   Northern District of California
    450 Golden Gate Avenue
9   10th Floor, Box 36055
    San Francisco, CA 94102

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 04-04368 JF
ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REMANDING TO THE
COMMISSIONER OF SOCIAL SECURITY FOR FURTHER PROCEEDINGS
(JFLC1)